■ The People of the State of New York, Respondent, v Allen Bell, Appellant. [60 NYS3d 12]—

Judgment, Supreme Court, Bronx County (Peter J. Benitez, J.), rendered July 2, 2013, as amended July 19, 2013, convicting defendant, after a jury trial, of attempted murder in the second degree, and sentencing him to a term of 25 years, unanimously reversed, on the law, and the matter remitted for a new trial.

Defendant Allen Bell was convicted of the attempted second-degree murder of Kevin Russo. Russo was shot once in the head, but survived his injuries with physical and psychological limitations. A disputed issue at trial was the extent he may have also suffered cognitive impairments, affecting the credibility of his testimony. Bell appeals from his conviction on the basis that the jury's verdict was against the weight of the evidence, and alternatively, that it was reversible error for the court to have admitted certain hearsay records in evidence without a proper foundation or limiting instruction. While we find that the verdict was not against the weight of the evidence, we reverse the conviction and remit for a new trial based upon the improper admission of hearsay evidence.

At about midnight on October 25, 2007, police responded to a "shots fired" 911 call and discovered two bodies at the top floor of a five story walk-up building on the Grand Concourse in the Bronx. The two-bedroom apartment (Newton's apartment) was a "stash" house where drugs where stored and sold. One body

was that of Daniel Newton, also known as "Danny," "D" or "B-Block," who was a large scale drug dealer. The other body was of Lumildy Rosado, Newton's girlfriend, known as "Mindy." Each victim sustained a single, close range gunshot to the head and each died immediately. A third victim, Russo, was also shot once in the forehead, but he survived. Russo remains paralyzed on one side and, at the time of trial, resided in a nursing home.

Bell, who is also known as "Butter," and his codefendant Raheim Bruno, were charged with murder in the first degree, two counts of murder in the second degree, attempted murder in the second degree, two counts of manslaughter in the first degree, assault in the first degree, and criminal possession of a weapon in the second degree, in connection with Newton and Rosado's murders. They were also charged with the attempted second-degree murder of Russo. Bell and Bruno were jointly tried. Each defendant was acquitted of the murder charges regarding Newton and Rosado, but convicted of Russo's attempted murder. In November 2016, this Court reversed Bruno's conviction and dismissed the indictment against him on the basis that there was insufficient evidence adduced at trial that he shared Bell's intent to cause Russo's death (*People v Bruno*, 144 AD3d 413 [1st Dept 2016], *lv denied* 28 NY3d 1182 [2017]).

The evidence at trial was as follows:

The police arrived at the apartment, finding two guns, approximately a kilogram of cocaine, marijuana, ecstasy pills, and approximately $5,000 in cash. Newton's body, found in the living room located in the rear right side of the apartment, had a single bullet hole in the back of his head. The furniture was overturned. Rosado's nude body was found in Newton's bedroom, to the left and rear of the apartment. The door to Russo's bedroom, located near the front entrance of the apartment, to the right of its interior hallway, had been kicked down or knocked off its hinges. The door was smeared with blood.

Officers were also dispatched to a nearby subway station at 171st Street and the Grand Concourse. Witnesses described seeing two men, one of them approximately six feet tall and light skinned black, possibly Hispanic. The officers also found an iced tea bottle in a nearby trash can and a white plastic bottle cap nearby. The bottle cap appeared to have blood on it. Both items were swabbed later and tested for DNA.

A police team investigated the apartment, tested for latent prints and swabbed various items believed to have human blood on them. They also searched for weapons and ballistics.

Altogether, 13 pieces of ballistics evidence were recovered, including: a discharged shell casing in the bedroom where the Rosado's body was found, a live cartridge in Russo's bedroom, another live cartridge in the apartment's interior hallway, and a third live cartridge in the living room, along with a discharged shell near Newton's body. Also recovered were two deformed bullets, two shell casings and a broken pistol handle, whose magazine contained three uncharged cartridges. The broken handle, from a 9 millimeter gun, was found near where Russo was shot. Another gun was found in a drawer in Newton's bedroom.

Two neighbors testified at trial. One witness, D.L., was 12 years old when the shooting occurred in 2007. D.L. lived next door to Newton and knew the victims well. D.L. testified that around midnight of October 25th, she was awakened by yelling, screaming and "tussling" next door. She heard someone calling for "Danny" and testified it sounded like someone was trying to break into Newton's apartment. While placing a call to her mother, D.L. heard a gunshot, a short pause and then another gunshot. D.L. testified she then heard a voice, which she recognized as Russo's, urgently saying "Yo D, Yo D, get up," a third gunshot and the sound of people running down the hallway stairs. She then heard someone repeatedly saying, "[C]ome on, come on . . . get the gun." D.L. also testified she heard someone say, "Gutta, get the gun."[1] According to D.L., Russo's urgent calling out to Newton came from somewhere near the front entrance to the apartment, where Russo's bedroom would have been. When police arrived and knocked on her door, D.L. did not answer, but remained silently inside. D.L.'s mother never took her to speak to the police and it was not until several years later, after running into Newton's sister in court, that D.L. came forward. T.J., who lived on the fourth floor, in the apartment below Newton's, also testified at trial. T.J. was familiar and friendly with the occupants of Newton's apartment. She testified that around midnight on October 25th, she heard loud noises, "tussling," and then a gunshot from the apartment above. She heard Russo screaming, "D, D," a second shot, then Russo screaming for somebody to call the police. T.J. called 911. She then heard a female screaming for help, more shots, more tussling and dogs barking, at which time T.J. placed a second 911 call. From the door's peephole, she had a direct view of the stairs leading down from the fifth floor. T.J. saw two men, one a light-skinned black or Hispanic male, running down the stairs holding something in his hand, resembling

---

1. "Gutta" was possibly a reference to "Butter," Bell's nickname.

a stick or a two-by-four piece of wood. T.J. also got a glimpse of a second person, running down from the fourth floor towards the floor below. She identified the second person as a black male. At trial, T.J. identified Bell as the light-skinned man she saw facing her as he ran down the stairs from the fifth floor. T.J. also testified that she overheard the second man who was in front say to the man behind him, "Yo Butters, did you get that?" or "Son, did you get that?" On cross-examination, however, T.J. admitted that she was not sure about what was said "five years ago" and she might have first heard the nick name (Butter) from others who were talking about the shooting. T.J. did not provide a usable description of the light-skinned male when she was interviewed by the police in October 2007. The first time T.J. provided a description of Bell was in January 2013 when the police showed her a photo array containing Bell's photo.

Lead detective Hennessey testified that his initial attempts to speak to Russo at the hospital after the shooting were unsuccessful, because Russo was unresponsive. By November 13th Russo was able to communicate by gestures, but still could not speak. Hennessey already had a tip, from an informant, that there was talk in the neighborhood that Bell and Bruno were involved in the shooting. Consequently on November 14th, Hennessey brought two photo arrays with him to the hospital. One array contained Bell's photo; the other contained Bruno's photo. Through a series of gestures, Russo was able to identify both Bell and Bruno in the photos and further convey that neither of them had a gun at the time of the shootings.

On November 16th, Hennessey located Bruno, who was brought to the precinct for questioning. During an "interview" that lasted 17 hours, Bruno provided a written and videotaped statement. Bruno's written and recorded statements were introduced in evidence. Insofar as relevant to this appeal, the statements contained the following facts:

Bruno denied that he or Bell had anything to do with the actual shooting, although they were present when it occurred. He explained that they fled the apartment immediately after it was over. Bruno stated that he and Bell were sent to Newton's apartment by "Sookie" to buy drugs from Newton. Sookie gave defendant $460 for the purchase and $20 for Bruno's own use. Newton, Bell, Bruno and Sookie all knew each other before the shootings from the Fulton Houses in Manhattan and their involvement in the drug "business."

Before heading from Manhattan to Newton's apartment, Bruno and Bell bought some marijuana and got high. Newton,

who was expecting them, let Bruno and Bell into the apartment. Bruno gave Newton the money and Newton went into the living room to get the drugs. Bruno stated that when he walked in, he noticed a man, who appeared to be in his 30s, wearing either braids or a do-rag, something hanging down each side of his head, maybe curls, sitting in one of the chairs in the living room. Bruno stated that, while he was playing with the dogs in the apartment, he saw the seated man suddenly get up, holding a black "cop gun" in his hand. The man wordlessly walked up to Newton, pointed it at his head and fired once. Bruno saw Newton spin and fall. Russo, hearing the gunshot, ran out of his bedroom, but when he saw the man had a gun, he turned around as if to either run towards the front door or back into his bedroom, but the man shot Russo in the face and he landed in the interior hallway of the apartment.

Bruno, who was high, panicked and started yelling for Butter; together they ran into Russo's bedroom and closed the door. Bruno then heard the shooter heard towards Newton's bedroom and start shouting "get the work, get the work," which he took to mean "get the drugs." Bruno heard a female voice answer "I don't know where nothing is at. I'm on your side," and then another gunshot. Bruno did not hear anything else from the female or ever see her before or after that.

The shooter then came to Russo's bedroom where Bruno and Bell were trying to hide. The shooter aimed his gun directly at Bell who "folded" himself over trying to protect himself. The gun jammed; it neither clicked nor fired. The shooter then started to rummage through their front pockets. Although he took Bruno's wallet and ID, he did not take the $15 that remained from the money Sookie had gave him or Bell's wallet. Bruno stated that the shooter then "breezed out the crib."

After the shooter left, Bruno and Bell fled the apartment. As they left, Bruno slipped on blood and almost tripped over Russo's body because there was "mad blood" everywhere. Bruno stated he got blood on his hand, leg and pants and Bell also had blood on his hand. The two of them went to a nearby subway station and headed back to Sookie's apartment to deliver the drugs. Bruno had stashed the package inside the front of his boxers, near his groin. While on the subway platform, Bruno and Bell tried to clean the blood off themselves by using the liquid from a bottle of "soda" they picked up off the ground and Bell's sweater. Bell saw he also had blood on his sneakers. Bruno stated he never called 911 because he did not know what to do and "didn't want to deal with cops."

Russo, who is the sole surviving victim of the shootings, also

testified at trial. After the shootings, Russo was taken to the hospital, undergoing life saving medical treatment, including being placed into a coma. He underwent surgery to remove parts of his skull, ease the pressure of his swelling brain and address some oozing brain matter. Russo's medical records reflect he underwent a partial frontal lobectomy. Russo's medical records, consisting of thousands of pages, were admitted into evidence, without objection. Only the People called a medical expert at trial.

On February 20, 2013, Russo took the witness stand at trial for the first time. He testified that on October 25, 2007, he came home from work, showered and went into his room, leaving the door open. Newton was in the living room watching TV and Rosado was in Newton's bedroom. Later that evening, Russo heard a knock at the front door and someone was let in. He could not see who came in or how many people there were, but could overhear Newton arguing with one other male, shouting, "[F]__ you, I ain't giving you shit" and "Get the f__ out of here." Russo then heard a gunshot from the apartment's interior hallway and Rosado screaming, "Please don't, please don't." Russo then heard a second gunshot, after which Russo did not hear Newton or Rosado anymore. Wrapped in a sheet, Russo left his bedroom and saw Newton laying on the floor unresponsive. When the prosecutor asked, "[W]hat happens next?," Russo testified that "[i]t went black, I must have collapsed . . . [f]rom my injury." Upon being asked questions about how he came to be shot, Russo responded that he "came to assist Danny and I ran into one of the perpetrators, started physically fighting with him . . . ." Russo described this as "an actual fistfight that I was desperate to win." When asked, "[W]ho shot you in the head?" Russo responded, "I cannot remember. After going blank, blacked out, I don't remember much. The next thing I remember after that was being in the hospital." When asked whether anyone else was present in the apartment other than Newton, Rosado, himself, and the person with the gun, Russo responded, "The dogs, that's it." The court followed up by asking, "So no one else was present?" and Russo responded, "No one else that I can remember." The court adjourned testimony for the day, dismissed the jury and held a conference with the attorneys.

At the conference, the prosecution made an application to introduce Russo's grand jury testimony into evidence as a past recollection recorded. Russo's grand jury testimony had been videotaped in December 2007, while he was still in the hospital. The court directed that a hearing be held the next day, outside

the presence of the jury, to ascertain whether a foundation existed to admit the grand jury testimony. In December 2007, before the grand jury, Russo had testified that Diaz, a friend, was in the apartment at the time of the shooting. Russo stated that Diaz came to the apartment with Bell and Bruno. Russo and Diaz were engaged in a fight when Diaz pulled a gun and shot him.

During the evidentiary hearing on February 21st, Russo was asked, this time outside of the jury's presence, whether he remembered who had shot him and whether he had told the truth before the grand jury. Russo testified that "yesterday" he had not remembered who shot him, and had watched the videotape, but "still don't remember." He testified Diaz was a "close friend" and that he had told the grand jury that Diaz was in the apartment when he was shot. When asked whether he presently remembered whether Diaz had been in the apartment that night, Russo answered, "No . . . I believe he was not in the apartment that night" and that he had "no idea" why he had said that, but that he had not lied and had made "a mistake." Russo also stated that he had truthfully testified that Bell had been the one who shot him and he remembered "Mr. Bruno and Mr. Bell" also being in the apartment that night. Russo denied that seeing the videotaped testimony had reminded him of what had happened, and stated that it was "the photo of my friend [Newton] on the ground [that] brung back that whole day like it was[,] just like it just happened." He denied anyone had coached him. At the conclusion of the hearing, defense counsel withdrew her application to admit the grand jury testimony in evidence.

After the jury was brought back into the courtroom, Russo resumed his direct examination. He testified that it was Bell whom he fought with that night and that it was Bell who had shot him in the forehead. Russo reiterated that it was seeing the photo of Newton, his dead friend, that "brung me back to that date" and no one had shown him any other photos since court had recessed the day before. Bell's attorney, thereafter, notified the court that if Russo denied making the statement about Diaz being present in the apartment on October 25th, he intended to impeach Russo with his grand jury testimony. Russo was unable to identify Bell in court and gave inaccurate testimony about Bell's age, stating that Bell was 16 years old at trial, which would mean that he was only 10 or 11 years old at the time of the shooting.

On cross-examination by Bell's attorney, Russo was asked about his grand jury testimony and why he had testified Diaz

was present in the apartment, if he was not. He answered that he knew "back then he wasn't there," and attributed his statement to the "condition I was in at that time." When pressed about whether he had "imagined that . . . Diaz was there," Russo answered, "I'm not going to say imagined. I wouldn't know why I said his name" and acknowledged that maybe he was "confused about other things in this case." He denied having had a fistfight with Diaz because "he wasn't there." Although Russo admitted that during his grand jury testimony the prosecutor had asked why he had said Diaz was present in the apartment the night of the shooting, Russo denied he had altered his testimony because of what she asked him, and stated, "I don't remember ever saying I was hitting Jose [Diaz]." After Bell's attorney read some of Russo's grand jury testimony into the record, Russo stated, "I remember the questions, but those answers make no sense to me." On redirect he was asked, "How did Jose Diaz come out of your mouth with respect to this?," Russo answered that he had "no clue," but denied that his "memory var[ied] from day to day," or that he had "ever been confused about who shot [him] in the forehead."

While cross-examining Detective Hennessey, Bell's attorney asked Hennessey "whether or not Jose Diaz may have been in the apartment on the night of the shooting . . . ." Hennessey replied that Diaz had been at work, in Florida, on October 25th. Hennessy's testimony was based on his investigation, during which he located Diaz in Florida and had, thereafter, been provided with time sheets on corporate letterhead, purporting to show that Diaz was working in Florida at the time of the shootings. The prosecutor sought to offer the time sheets into evidence. Bell's attorney initially had no objection but after hearing Bruno's attorney object, qualified his response by adding that he did not object "[o]nce the proper foundation has been laid," stating that he had been "thinking it is a business record; therefore I'm thinking business record exception," but before he could complete his statement, Bruno's attorney interrupted, stating, "It's hearsay, Judge."

Bell's attorney stated that it was his position that Diaz was in the apartment when the shooting took place, to which the court responded that "obviously [Diaz's] alibi cannot be proven by the records which are in the possession of the Detective . . . ." At that point, Bruno's attorney objected that the records could only be introduced "through the proper sponsoring witness" such as a "custodian of records from th[e] company," because the records were not reliable or self-authenticating. After argument, the court ruled that although Bell had the right

to inquire about whether a third party committed the crime he was charged with, Hennessey's testimony in response to such inquiry was hearsay and that by eliciting such hearsay from Hennessey, defense counsel had "opened the door" and thereby, "waived [any] evidentiary objection" to the admission of the time sheets. Although the court gave a limiting instruction it was not as broad as requested by Bell's attorney.

The People also introduced the results of forensic DNA analysis of the several swabs and samples that were recovered from the apartment and subway station during the investigation, including blood from the interior hallway near Russo's bedroom, the broken pistol handle, the bottle and bottle cap found in the subway station and the gun found in the drawer in Newton's bedroom. The results of such testing had been compared to Newton's, Rosado's, Bell's and Bruno's DNA samples, but no blood sample was ever obtained from Russo. Through such DNA testing, three distinct male profiles were developed, designated as Male Donor A, Male Donor B, and Male Donor C. Bruno's DNA did not match any of the profiles that were developed, and he was excluded as a contributor to any of the samples that were analyzed. Bell was determined to be Male Donor B and determined to be the source of the blood sample on the bottle cap. Bell was also found to be a likely contributor to the mixture on the bottle itself. Male Donor A's DNA was on the swab taken from the interior hallway of the apartment and a major contributor to the DNA mixture found on the broken pistol handle found near Russo.[2] A ballistics expert testified that the two deformed, discharged bullets were fired from one gun, and the two spent shell casings also came from one gun, but the expert could not confirm that all four ballistic items came from the same gun. Accordingly, the expert concluded that "a minimum of one, maximum of two" firearms were the source for the two shell casings and two deformed bullets.

The People also called Dr. Ronald St. Louis, who was qualified as an expert in internal medicine. Dr. St. Louis had been Russo's primary physician for two years preceding trial. He testified that Russo is paralyzed on one side and also unable to open his right eyelid. Russo suffers from depression and has anger management issues. Notwithstanding medical records to the contrary, Dr. St. Louis, however, denied that any part of Russo's brain was removed, admitting only that part of his skull was removed immediately after the shooting. Dr. St. Louis acknowledged on cross-examination that the type of injury

---

2. On appeal the People concede that Male Donor A is "likely" Russo.

Russo has can affect someone's memory, but testified that Russo is "very aware," and his mental condition has not deteriorated. When asked about a medical record made in January 2011, indicating that Russo sustained long-term memory loss and has difficulty making decisions, Dr. St. Louis claimed he did not know Russo when the record was made and it did not describe his current status. The document is part of the care plan for Russo at the Beth Abraham Health Services facility where Russo lived and Dr. St. Louis worked.

Bell requests that this Court reverse on a weight of the evidence review. This is a two step process that begins with an analysis of whether an acquittal would not have been unreasonable (*People v Romero*, 7 NY3d 633, 636 [2006]). If so, the Court then "must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions" (*People v Danielson*, 9 NY3d 342, 348 [2007]). In this regard, the Court is essentially seated as the thirteenth juror, deciding which facts were proved at trial (*id.* at 348). The factfinder's opportunity to view the witnesses, hear the testimony and observe demeanor is afforded great deference (*People v Kancharla*, 23 NY3d 294, 303 [2014], citing *People v Bleakley*, 69 NY2d 490, 495 [1987]). If the jury's verdict was not against the weight of the evidence, it will not be disturbed, but if it failed to give the evidence the weight it should be accorded, then the verdict may be set aside as being against the weight of the evidence (*Danielson* at 348-349).

Even though an acquittal would not have been unreasonable, based on the weight of the credible evidence, the jury was justified in finding Bell guilty beyond a reasonable doubt (*id.*). Bell's weight of the evidence argument primarily focuses on Russo's seemingly confused and irreconcilable testimony at trial about the events surrounding the shooting, first testifying that he could not remember what happened that night, yet testifying the next day he remembered the evening in detail, including that it was Bell who shot him. Notwithstanding that testimony, Russo also acknowledged that he may have been "confused" about things that happened during the shooting. Bell seeks to buttress his argument about Russo's unreliability as a witness by drawing upon statements, reports and other information contained in the thousands of pages of medical records in evidence. Bell contends the records document not only Russo's injuries, but support his claim that when Russo underwent a partial frontal lobectomy, part of Russo's damaged brain was removed, affecting his memory. Bell argues

that the jury's ability to properly weigh the reliability of Russo's account of the shooting was undermined by Dr. St. Louis's testimony, incorrectly stating that Russo's brain remains intact and that he suffers from no memory loss. Bell seeks to highlight Russo's unreliability by pointing to his other inconsistent testimony, for instance, Russo's insistence at trial he was only 32 years old, though informed he was older; Russo's failure to make an in-court identification of Bell the first day he took the stand, although Bell was in court and they have known each other for several years; Russo's statement that Bell was, at the time of trial, about 16 years old, meaning Bell would have been only 10 or 11 years old when the shooting took place in 2007, and Russo's testimony about the layout of Newton's apartment and that there were three, not two bedrooms. Finally, Bell points out that none of the DNA testing identified his blood as having been recovered from the apartment, that the live cartridges recovered in the apartment, particularly near Russo's bedroom, where Bruno claimed he and Bell attempted to hide, is evidence that they would also have been victims, but for the pistol jamming when the shooter came into the bedroom.

It is possible for the prosecution to prove its case even if the complaining witness cannot remember details of the crime because of impaired memory (*People v Vargas*, 176 AD2d 450 [1st Dept 1991], *lv denied* 79 NY2d 865 [1992] [the defendant was convicted of attempted murder of complaining witness who suffered from amnesia as a result of being shot in the head by the defendant]). Russo was not the only witness to testify about the events of October 25, 2007, and there was also DNA evidence; collectively, this evidence was weighed by the jury. A rational jury could have concluded that Bell's guilt was established beyond a reasonable doubt. Bell's codefendant, Bruno, not only placed Bell at the scene of the crime, Bell was present throughout the entire incident. Bell was identified by T.J., the neighbor, as the man she saw fleeing from the 5th floor, and Bruno was overheard by neighbors telling Bell or "Butter" to "get the gun." Bell was injured and bleeding that evening. Blood was recovered on the plastic bottle cap found on the subway platform, and DNA testing confirmed that the blood matched the sample Bell provided. The DNA match supports a rational view of the evidence that Bell was injured when he engaged in a fistfight with Russo—the same fistfight Russo testified at trial that he "was desperate to win," a loud struggle that was overhead by both neighbors who testified.

In conducting a weight of the evidence review, the jury's determination is afforded great deference because the jury had

the "opportunity to view the witnesses, hear the testimony and observe demeanor" (*Romero*, 7 NY3d at 643-644 [internal quotation marks omitted]). Furthermore, any inconsistencies or deficiencies in Russo's testimony only implicate issues of credibility. The jury credited Russo's identification of Bell as the shooter and there was other evidence of his guilt. Likewise, it was the jury's province to either accept or reject, in whole or part, Dr. St. Louis's evidence about Russo's cognitive capacity and ability to recall events. Although an acquittal would not have been unreasonable in this case, the evidence is of such weight and credibility warranting a conclusion that the jury was justified in finding defendant guilty of attempted murder in the second degree beyond a reasonable doubt (*id.* at 643).

Notwithstanding that the verdict survives a weight of the evidence analysis, we find that the court committed reversible error in admitting Diaz's time sheets into evidence. The business records of Diaz's employer were admitted without a proper foundation, and the court failed to clearly instruct the jury that the time sheets could not be considered for the truth of their content. The jury was not told that the time sheets could not be relied upon to conclude that Diaz was not in the apartment at the time of the shootings. The business records exception to the hearsay rule is codified in CPLR 4518 (a), and it also applies in criminal cases (CPL 60.10; *People v Cratsley*, 86 NY2d 81, 89 [1995]). For a business record to be admissible, it must be made in the regular course of business, it must be the regular course of business to make the record, and "the record must have been made at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter, assuring that the recollection is fairly accurate and the entries routinely made" (*Cratsley*, 86 NY2d at 89). Business records are customarily offered through a foundation witness, such as the custodian of the records or an employee who is familiar with the record-keeping procedures of the record maker (*People v Kennedy*, 68 NY2d 569, 578 [1986]).

We reject the People's argument that the evidentiary issue is unpreserved. Bell's attorney, individually, and in tandem with Bruno's attorney, timely objected to the introduction of the time sheets. Although Bell's attorney's objection may have been awkwardly stated, the nature of his objection on Bell's behalf is unmistakable: Bell's attorney made it clear that he had no objection to the time sheets coming into evidence, provided that the prosecution was able to lay a proper foundation for their introduction as a business record. Contrary to the court's ruling, Bell's attorney's cross-examination of Hennessy about

his investigation into Diaz's whereabouts on October 25th did not open the door to the introduction of the time sheets.

The People argue that the time sheets were admitted not for the truth of their content, but only to rebut defense counsel's extensive challenges to the adequacy of the police investigation, and that the court's limiting instruction was adequate. The limiting instruction that the court gave was imprecise and confusing. The court only instructed the jury that the time sheets were "being received in evidence as documents which [Detective Hennessey] says reflect what efforts he did and what information he received on a very particular subject matter . . . ." The court did not clearly instruct the jurors that they were not to consider the time sheets in determining whether Diaz was in the apartment at the time of the shootings. This error was not harmless. There was a substantial disputed issue about whether Diaz was the additional person in the apartment, whom Bruno identified as the shooter. This conclusion was also supported by Russo's grand jury testimony, even though Russo later repudiated it. The time sheets established an alibi for Diaz, that he was in Florida on October 25, 2007. Bell's defense was that he did not shoot Russo, and someone else in the apartment did the shooting. Allowing the time sheets into evidence was not harmless error because there was "a significant probability . . . that the jury would have acquitted the defendant had it not been for the error" (*People v Crimmins*, 36 NY2d 230, 242 [1975]). Consistent herewith, we therefore vacate the conviction and remit for a new trial.

Since we vacate the conviction, we do not reach Bell's other arguments, including his alternative request for relief. Concur—Friedman, J.P., Richter, Gische and Gesmer, JJ.