People v Weinstein (2022 NY Slip Op 03576)

People v Weinstein

2022 NY Slip Op 03576

Decided on June 02, 2022

Appellate Division, First Department

Mazzarelli, J., 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: June 02, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Judith Gische Cynthia S. Kern Angela M. Mazzarelli Ellen Gesmer

Ind. No. 2335/18, 2673/19 Appeal No. 15103 Case No. 2020-00590 

[*1]The People of the State of New York, Respondent,
v
Harvey Weinstein, Defendant-Appellant.

Defendant appeals from a judgment of the Supreme Court, New York County (James M. Burke, J.), rendered March 11, 2020, convicting him, after a jury trial, of criminal sexual act in the first degree and rape in the third degree and sentencing him to consecutive terms of 20 years and 3 years, respectively.

Aidala, Bertuna & Kamins, PC, New York (Barry Kamins, John Leventhal and Diana Fabi Samson of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Valerie Figueredo, Alice Wiseman and Eleanor J. Ostrow of counsel), for respondent.

Mazzarelli, J., 

Defendant Harvey Weinstein, a famous and highly successful movie and television producer, was charged with one count of criminal sexual act in the first degree against Miriam Haley, and rape in the first degree and rape in the third degree against Jessica Mann. He was also charged with two counts of predatory sexual assault, based on his alleged assaults of Haley and Mann, two women who were trying to make a name for themselves in the entertainment industry. Shortly before trial, the People were granted permission to include defendant's alleged rape of Annabella Sciorra, a well-known actor, in 1993, as an alternate predicate to each count of predatory sexual assault.
As relevant here, the trial featured testimony from Haley, Mann, and Sciorra. In addition, three other women testified who were burgeoning actors. They alleged that they too were sexually assaulted by defendant. The People offered their testimony as Molineux evidence (People v Molineux, 168 NY 264 [1901]). Molineux evidence relates to crimes or bad acts committed by a criminal defendant that are not part of the pending case, but which helps to explain the conduct for which the defendant is being tried. Here the evidence was offered by the People because of the multifaceted nature of defendant's relationships with Haley and Mann. These relationships included episodes of consensual sex, some of which occurred after the alleged assaults, and behavior by complainants in the days and even years after the charged episodes, that to jurors could seem incongruent with what would be expected from a victim of a sex crime. The trial court agreed with the People that complainants' behavior before and after the sexual encounters risked masking the fact that the alleged assaults were nonconsensual, and that the Molineux witnesses placed the incidents in a more accurate context.
Another witness was Dr. Barbara Ziv, a forensic psychiatrist. The People presented her as an expert on the subject of rape trauma syndrome, a recognized phenomenon that causes victims of sexual assault to engage in behavior vis-Á-vis their assailants that is counter-intuitive to what outside observers would expect. Defendant hoped to counter Dr. Ziv's testimony with that of two experts, Dr. Deborah Davis and Dr. Elizabeth Loftus, whom he offered for the purposes of testifying about factors affecting memory of sexual encounters, or statistics [*2]on false or delayed reporting of sex offenses. However, while the court ruled that both witnesses could testify about memory in general and how it is flawed in its ability to recover traumatic events, it precluded testimony about how memory of sexual assault is specifically affected. In the wake of that ruling, defendant decided to have only Dr. Loftus testify on his behalf.
Defendant did not testify. Had he chosen to do so, the People were prepared to subject him to a cross-examination that exposed to the jury a host of evidence intended to impeach his credibility, such as deceptive acts and bullying behavior that included infliction of mental and physical abuse on people who worked for him. The material that the People sought permission to introduce into the trial through a Sandoval (People v Sandoval, 34 NY2d 371 [1974]) motion consisted of 32 separate bad acts. In the end the trial court precluded the People from making any reference to certain acts that would be too prejudicial or too non-specific, or where a ruling in the People's favor would be inconsistent with the limitations the court placed on the People's ability to present Molineux evidence.
Other witnesses whose testimony was relevant to the arguments presented by defendant on this appeal included Emmanuella Postacchini, an Italian actor who Haley alleged defendant arranged, without her consent, to engage in group sex with her and defendant. In addition, the People called the actor Rosie Perez, a close friend of Sciorra's, to corroborate the latter's testimony about defendant's alleged rape of her. The People also presented the testimony of Elizabeth Entin, a friend of Haley's who discussed conversations with Haley immediately after defendant's alleged assault of Haley. Defendant called Talita Maia, a friend of Mann's, and Tommy Richards, another friend of Mann's who was also a talent agent. They testified about, inter alia, Mann's behavior immediately after the incident that formed the basis of the rape charges against defendant.
Defendant was acquitted of the charge of first-degree rape against Mann and both counts of predatory sexual assault and convicted of third-degree rape against Mann and first-degree sexual act against Haley. On appeal, he maintains, inter alia, that the conviction for third-degree rape against Mann was based on insufficient evidence, and that that conviction, as well as the conviction for first-degree sexual act against Haley, were against the weight of the evidence. He argues that the complainants' behavior both before and after the charged incidents, which included voluntary sex, and sending communications to him that were both flattering and affectionate, belie the People's theory that the complainants did not consent to those sexual engagements. He further claims that the trial court unduly prejudiced him and prevented an acquittal by admitting the testimony of the three non-complainant women regarding sexual offenses committed against them by defendant[*3]. In addition, he argues that the court granted the People's Sandoval application without regard to the fact that the sheer number of bad acts it allowed the People to use in cross-examination would preclude him from taking the stand in his own defense, for fear that those uncharged acts would, on their own, poison the jury against him. Defendant also contends that the trial was unfair because the court permitted the People's expert witness to opine on the complainants' credibility, while severely curtailing his own experts' testimony. In addition, defendant maintains that the court unfairly permitted one of the jurors to sit and participate in deliberations notwithstanding that she allegedly lied to get a spot on the jury and was biased against him because she had been a victim of sexual abuse, was intimately familiar with the dynamics between predatory men and their victims, and had a profit motive for serving.
For the following reasons, we reject defendant's arguments, and affirm the conviction in all respects.
At the time of the acts which formed the basis of the charges, defendant was familiar with both Haley and Mann, who came to know him after he met them at industry events (Haley at a movie premiere in London in 2004, Mann at a party in Hollywood in 2013). He knew Sciorra because she had acted in a movie his company produced. The following is a brief recapitulation, derived from the women's testimony at trial, of defendant's relationships with each woman up to, including, and following the incidents that resulted in his conviction.
In May 2006, Haley saw defendant at a party at the Cannes Film Festival, where she asked defendant if she could work on any productions his company was making in New York. Defendant told her to come see him at the Majestic Hotel in Cannes, where his company, the Weinstein Company (TWC), had an office. When she arrived, defendant commented on her legs, and asked her if she would massage him, or if he could massage her. She declined and left. After the festival, defendant's company offered Haley a job as a production assistant on a TV show, Project Runway. Haley accepted the job, and when the season ended, she emailed defendant thanking him. In reply, he asked her to meet him at a bar in the Mercer Hotel in Manhattan, where he told her that Fher work had been well-received, and that she could work on the series again the following year.
A few days later, Haley, defendant, and Barbara Schneeweiss, a TWC employee, met at a TWC office to discuss other productions, and then defendant drove Haley to her East Village apartment. He asked to see the apartment, but she said it was not a good time. He said he was going to go to Paris for fashion shows and asked her to go with him. She did not want to go because the trip would not be work-related, but she said she would think about it. Defendant or his assistant repeatedly called Haley during the day, asking if she would reconsider, but she declined. Later that day, defendant [*4]called Haley from outside her building, to which he had come unexpectedly. He told her that he wanted to see her for five minutes, but she refused. Not wanting him to enter the building, she met him at the front door. When she opened the door, defendant walked past her into the building and into her apartment. When Haley joked that she had heard defendant had a "terrible reputation with women," he left.
Later, in July, 2006, defendant offered to pay for Haley to fly from New York to Los Angeles to attend the premiere of a movie his company had produced. Haley accepted the offer because she had been planning a trip to Los Angeles to visit a friend. Shortly before the flight, defendant or his assistant called Haley and asked her to meet him at his Soho apartment. Haley agreed, and was later driven by defendant's driver from her apartment to defendant's. The driver rode up with her in an elevator that opened directly into the apartment and then left. Defendant and Haley began to engage in normal conversation on a sofa when defendant "lunged" at her and tried to kiss her. Haley attempted to push him away, but defendant pulled her back toward him, touching and kissing her. When Haley got up from the sofa, defendant pulled her back towards him. When Haley tried to walk away, defendant used his body to move Haley, who weighed about 115 pounds (considerably less than defendant) to the bedroom, where he pushed her onto the bed. She tried to flee by kicking and pushing, but he pinned her down by her wrists and laid on top of her. Haley told defendant she did not want his advances and repeated "no" while he ignored her words of protest. Defendant held her down on the bed while "forc[ing]" his mouth on her vaginal area. She said she was having her period and was wearing a tampon. Defendant pulled out the tampon and resumed the oral contact. Haley was in shock and unsure what to do, especially because she thought defendant's driver might be standing outside the apartment and could prevent her from leaving. She decided to "endure" it. Haley did not report the assault at the time because she had worked for Project Runway on a tourist visa and was concerned about the immigration consequences. She also took into consideration defendant's "power, resources and connections." Defendant was eventually charged with criminal sexual act in the first degree as a result of this incident.
This was not the last time that Haley saw or interacted with defendant. In fact, Haley flew to Los Angeles the next day with a ticket purchased by TWC, and returned two weeks later. She did not see defendant when she was in Los Angeles, although he called her, sounding irritated, after she failed to appear for the movie premiere that was the ostensible purpose of his having purchased the plane ticket for her. After she returned to New York, defendant repeatedly asked her to meet him at the Tribeca Grand Hotel in Manhattan, and Haley agreed to do so two days after she arrived back in New [*5]York. On that day, she was escorted to defendant's hotel room, where defendant immediately grabbed her arm and led her to the bed. Haley did not resist, and laid in bed motionless while defendant called her names such as "bitch" and "whore," and proceeded to have intercourse with her. Haley testified that she did not want to have sex with defendant that night and had not done anything to indicate that she did. Haley continued to stay in touch with defendant for over two years, meeting him once to pitch a television show, and sending him several emails, which, inter alia, thanked him for his help with her career, sent him her "love" or said that it had been "great" to see him. Mann met defendant in early 2013 at a party in Hollywood. Defendant expressed interest in Mann's acting career, and told her he would like to follow up with her. She gave him her phone number. At some point after the party, defendant arranged to meet Mann at a bookstore in Los Angeles, where he bought her some books and told her that he wanted to integrate her into his team. She later met him and his assistant at a restaurant in Los Angeles, where they discussed her experience and she provided the names of her manager and agent.
On a later day, at the Peninsula Hotel in Los Angeles, Mann met defendant for dinner, but he seemed to become irritated when other customers interrupted them to praise his work. To avoid further disturbances, Mann accepted defendant's suggestion that they finish dinner in his room. After hotel staff brought the food to his room, defendant removed some of his clothing, went to the bedroom, and called out for Mann to join him there. She reluctantly did so and found him shirtless. He asked her to take off her shirt so he could give her a massage. She said she did not want one, but she did not want to offend him because of the possible influence he could have on her career, and agreed to massage his back. She spent about 5 or 10 minutes massaging his back with lotion that he had given her.
Within the next month or so, the two met for coffee in Beverly Hills, and defendant invited her to awards parties. On February 24, 2013, defendant invited Mann and a friend of hers to have drinks with him at the Montage Hotel in Los Angeles. Mann was hesitant to go, but her friend said they should go because of defendant's stature as a Hollywood producer. In a bar at the hotel, defendant told the women they would be "perfect" as leads in a movie he was producing, which led Mann to believe she was going to be cast in the movie. As the bar was closing, defendant asked the women to come to his hotel room so he could show them the screenplay. Mann initially declined, but relented after defendant told the women they had nothing to worry about. When they arrived at the room, defendant began removing his formal wear and then went into a back room. While the women sat on a couch waiting for defendant, he entered the bedroom and called for Mann. Mann walked to the door and [*6]asked what he wanted. After telling Mann's friend that he and Mann would "just be a minute," defendant used one hand to grab Mann's arm and pull her toward him into the bedroom and used his other hand to close the bedroom door behind them. Defendant grabbed her arms, pushed her, and tried to kiss her. She repeatedly said "whoa" and made other comments such as "I don't know you" and "I am not sexual." He said he would not let her leave until he did something for her. Mann tried to reach for the door, but defendant tightened his grip around her arm. He seemed to become angrier the more she resisted, so she tried to joke to calm him down. He told her to sit on the bed, which she did. Then he reached under her dress, pulled down her underwear, and put his mouth on her vaginal area. Feeling overwhelmed, Mann "shut down" and did not call for help. She "fake[d] an orgasm" in order to leave. Defendant asked if she "liked it," and she falsely said "it was the best I ever had." Mann felt confused about what happened, and, wishing to "undo" the incident, decided to start a romantic relationship with defendant. For weeks after the incident, defendant and Mann had consensual oral sex.
The next night, Mann went to defendant's room, where he was with Postacchini, the Italian actor. Defendant said he wanted to have a "threesome" with the women. Mann felt uncomfortable and noticed that Postacchini, whose English was limited, seemed nervous. Defendant told them to undress in the bedroom. Postacchini took off her clothes, and Mann removed her top. Defendant told Mann to perform oral sex on Postacchini. Both women indicated that they had no experience with oral sex between women or threesomes. Mann testified that once she touched Postacchini's breast, Mann "saw [her]self in" Postacchini, cried, and ran to the bathroom. Postacchini later found Mann in a fetal position on the bathroom floor.
In March 2013, Mann traveled with her friend Tommy Richards, a talent agent, to New York. Mann and Richards shared a room at the Doubletree Hotel in midtown Manhattan. Richards asked to meet defendant, and, hoping that Richards would take her on as a client, she arranged breakfast at the hotel with herself, defendant, Richards and her friend Talita Maia. Defendant arrived at the hotel early, and when Mann went down to the lobby to meet him, she found him at the front desk, where he asked for a room using an alias. She asked him why he was getting a room, but he did not respond. Mann was nervous that, based on past experience, defendant intended to use the room to extract sexual favors from her as consideration for having agreed to meet Richards. Defendant pulled her aside and told her not to embarrass him. After receiving the key, defendant put his arm on Mann and led her to the room, although she told him she did not want to go. In the room, Mann told defendant they did not have time because her friend would be there soon. Mann tried twice to leave by opening the door to the room[*7], but each time defendant blocked her by putting his hand on the door above her head and slamming the door shut. Defendant angrily told her to undress, and when she did not comply, he grabbed her hand and used it to "force" her to undress, after which she finished undressing herself, since she felt she had no choice and was trapped. Once she was naked, defendant told her to lie down in bed. He entered the bathroom and returned to the bedroom naked. He got on top of Mann, who was lying on her back in bed and could not move under his weight. Defendant proceeded to have penetrative sex with Mann. For this incident defendant was charged with rape in the first and third degrees. Maia and Richards collectively testified on behalf of the defense that they noticed nothing amiss about Mann that morning and that she and defendant were friendly with each other. Richards testified that Mann told her she was going to spend an extra day in New York with defendant, instead of flying back to Los Angeles that day with Richards, as originally planned.
After that incident Mann maintained her relationship with defendant, and sent him numerous emails that were friendly and flattering in nature. In February 2014, Mann went to meet defendant at his room in the Peninsula Hotel in Los Angeles. She decided that during that meeting she would tell defendant about her relationship with an actor she was dating. After defendant became aware of that relationship, defendant yelled, "[Y]ou owe me one more time[!]," dragged her to the bedroom, threw her onto the bed and told her to take off her clothes. She protested, but defendant lunged at her and removed her pants, scratching her legs in the process. She "froze," struggled to keep her balance, and curled into a ball on the bed. After going into the bathroom, defendant grabbed Mann by her ankles, pulled her down the bed, pushed her legs apart, put his mouth on her vaginal area, and then got on top of her and inserted his penis into her vagina. She blacked out, until she realized she was kneeling while defendant was putting his penis in her mouth, after which he ejaculated into her mouth. Mann continued to communicate with defendant after that incident, sending him flattering emails and seeking out his advice about matters both personal and professional. She also participated in occasional sexual encounters with him.
Sciorra acted in a movie produced by defendant in 1993. After they attended the same event later that year, he dropped her off at her apartment in the Gramercy area of Manhattan around 10:00 p.m. About half an hour later, after changing into a nightgown, she heard a knock and opened her door. Defendant walked into her apartment and started unbuttoning his shirt. She told him to leave, but he kept approaching her. She backed down her hallway, hitting a door frame. He brought her to the bedroom by grabbing her nightgown collar and pushed her onto the bed. Sciorra, who weighed about 110 pounds, punched and kicked the [*8]much larger defendant, who got on top of her, used one hand to place her hands above her head, and inserted his penis into her vagina. He ejaculated on her leg before performing oral sex on her. She blacked out. Rosie Perez testified that Sciorra told her on the night of the incident that she thought she had been raped, and told her later that defendant was the perpetrator.
As noted above, the People moved before trial to introduce certain Molineux evidence. The court's order permitted the People to ask about the incident between defendant and Mann at the Montage Hotel in Los Angeles, and the incident between him and Mann that occurred at the Peninsula Hotel in Los Angeles after the charged rape. The court also permitted Mann's testimony as to behavior by defendant that she perceived as threatening, including where defendant bullied staff at a restaurant, and told her that he had people he could send to her father's house to assault him after she complained to defendant about issues she was having with her father.
The court also allowed the People to introduce the testimony of three of five different women who the People had identified as having alleged that defendant committed sexual offenses against them, Lauren Young, Dawn Dunning, and Tarale Wulff. A description of their testimony follows.
In February 2013, Lauren Young, an aspiring actor, met defendant through another actor, who knew that Young was writing a script. A meeting among the three took place at the bar in the Montage Hotel in Los Angeles, where defendant encouraged Young to participate in the television show America's Next Top Model and told her he would arrange for her to meet his assistant the next day. Defendant said he needed to get ready for an awards ceremony that evening, and asked Young and the other actor to continue the meeting in his hotel suite. Defendant entered the suite, followed by Young, who was led by defendant into a bathroom. Young's friend closed the bathroom door behind Young, leaving Young alone with defendant in the bathroom. Defendant undressed, entered the shower, and turned on the water for a few seconds, while the shower door stayed open and blocked the bathroom door. Young felt "trapped" as defendant exited the shower and told Young they were going to "have a nice talk." He dropped a towel he had been wearing, and she turned toward the sink to avoid seeing him naked. He unzipped and unbuttoned her dress, turned her toward him, pulled down her dress to her elbows, and pushed her against the sink. He grabbed her breast while using his other hand to masturbate. Throughout the incident, Young repeatedly said "no," that she was "not interested," and that she had a boyfriend. Defendant said: "[H]ow am I going to know if you can act[?] . . . This is what all actresses do to make it." He moved his hand toward her genital area, but she blocked his hand. While still holding her breast, he ejaculated onto the towel and then left, still naked.
In 2004 or 2005[*9], Dawn Dunning was working in a Manhattan club when the owner pointed out defendant to her. Dunning told defendant she was an actor, and he offered to help her. She gave him her phone number. Defendant's assistant called her to arrange for all three of them to have lunch in Manhattan. After the lunch, Dunning and defendant continued meeting. She participated in a screen test in the office of Miramax, one of defendant's companies, and she and her fiancÉ accepted several invitations from defendant to parties. In the Spring of 2004 or 2005, Dunning met defendant in a Soho hotel suite with other people, who were working on a movie. Defendant brought Dunning into the bedroom, where they sat on the bed and talked. He put his hand under her skirt and underwear, and inserted his finger into her vagina, and she "froze." Then she stood up, and he apologized and said it would not happen again.
Weeks later, defendant's assistant arranged a meeting between defendant and Dunning in a hotel. At the hotel, Dunning met the assistant, who brought her to defendant's room, where he opened the door wearing only a bathrobe which exposed his abdomen. In the room, Dunning saw stacks of paper on a table, and defendant told her he had contracts for three movies which he would sign if she agreed to group sex with him and the assistant. Dunning looked at the assistant, who had a blank expression. When Dunning started laughing, defendant yelled that this was "how this industry works," and she would "never make it in this business." She ran out of the room while defendant kept yelling.
In 2005, Tarale Wulff was waiting on defendant at Cipriani SoHo Upstairs when he complimented her appearance and asked what she did when she wasn't working in the restaurant. Wulff said she was an actor, and defendant said she should talk to his team. They exchanged contact information. About 15 minutes later, while Wulff was wiping down the bar, defendant grabbed her arm and led her through a back door into a hall. At first she thought he wanted to continue talking away from the noisy restaurant. He brought her upstairs, through a room with employees' lockers, and onto an unoccupied terrace, where he pulled her arm to move her so she was facing him. She said she needed to go back to work, but he repeatedly said "one second." She saw his repeated hand motion under his untucked shirt and realized that he was masturbating. Wulff returned to work and did not see defendant again that night. About a week later, Wulff accepted an invitation to audition at defendant's office, where a woman brought her to an empty room, gave her an envelope containing a screenplay for a movie, and said she would audition for a role in the movie. Later, a woman entered and told Wulff a car was waiting for her. A car drove her to defendant's apartment in Manhattan. The driver told her which floor to go to, and she rode an elevator that opened directly into defendant's apartment on that floor, where she saw him wearing [*10]pants and an open shirt. He asked if she had received the script. She sat on a couch waiting for him. He called out from another area, and she kept talking to him while walking toward the sound of his voice, eventually entering the bedroom, where he turned her around by her arms and put her onto the bed. He leaned onto her and weighed her down on the bed. Defendant was much heavier than Wulff, who was 5 feet 10 inches tall and weighed about 125 pounds. She said "I can't," but he told her not to worry because he had had a vasectomy. She froze and looked away while he put his penis into her vagina. Then defendant took Wulff back to his office, where she was given a copy of the same screenplay and told to come back when she was ready to audition.
The People's expert, Dr. Barbara Ziv, is a forensic psychiatrist who has evaluated over 1,000 victims of sexual assault. She testified that she did not interview any of the complainants in this case, nor had she evaluated them in any way. She stated that her testimony was based on her general experience in the field. Dr. Ziv discussed rape trauma, which she defined as the responses victims of sexual assault experience. She also explained "rape myths," which are preconceived notions, widely and persistently held, about how victims should respond to sexual assault, that are often wrong. Examples of rape myths, Dr. Ziv explained, are that most rapes are committed by a stranger, where in reality less than 15% are committed by people not known to the victim. Other misconceptions, she explained, are that most victims resist their assailants, that they promptly report an attack to a doctor or the authorities, and that they cut off contact with the perpetrator. Indeed, a victim will often maintain contact with an offender, and even develop a relationship with their attacker after the assault. The reason victims of sexual assaults often maintain contact with a perpetrator is because they fear doing otherwise will cause the latter to take steps that will impact their reputation, friendships and careers. Dr. Ziv also testified about how memory is affected by a traumatic incident, including a sexual assault. Because the traumatic nature of the experience causes the brain to focus narrowly, she explained, and de-emphasize external data that is not relevant to the immediate experience, people who are subject to such incidents will have clear memories of them.
Defendant offered the expert testimony of Dr. Elizabeth Loftus, an experimental psychologist who specializes in the field of human memory. She testified that being exposed to misinformation after an event can lead to false memories of the event, citing the example that 80% of people who experienced a simulated car accident falsely believed that the accident involved a stop sign, after being told so. She explained how ordinary people can have entire events planted into their minds and how one can change a person's feelings about an event by supplying post-event information[*11]. Dr. Loftus also discussed the effect of urging a person to remember, which can lead to false recollection, and also said that extreme levels of stress and fright can impair one's memory, particularly for peripheral details. She further testified that a traumatic event is not "indelibly imprinted in one's memory," but can fade over time in a manner similar to memories not formed in the context of trauma.
We first address defendant's procedural claims, and then his various arguments that the trial was patently unfair, and finally his position that, in any event, the People did not present sufficient evidence to convict him and that the evidence weighed in his favor.
Defendant first claims that the two counts of predatory sexual assault against him violated the Ex Post Facto Clause (US Const, art I, § 10, cl 1), since they were supported by the alleged rape of Sciorra, which occurred 13 years before the predatory assault statute was enacted, and which the People were time-barred from pursuing as a standalone charge. In other words, defendant maintains, the People were improperly bootstrapping by using the predatory sexual assault statute to convict him for a crime that was beyond the relevant limitations period.
We reject this argument as moot, defendant having been acquitted of predatory sexual assault (see People v Shearin, 177 AD3d 504, 504 [1st Dept 2019], lv denied 34 NY3d 1162 [2020]). Further, to the extent defendant argues that the very injection of the testimony by Sciorra prejudiced him, we find that he did not establish any such prejudice (see People v Flores, 284 AD2d 123, 123 [1st Dept 2001], lv denied 98 NY2d 710 [2002]). Defendant's argument that Sciorra's reference to Hollywood celebrities, and the corroborating testimony of Rosie Perez, had the effect of turning the jury against defendant, is wholly speculative, considering the jury's rejection of the charge supported by the allegations involving Sciorra.
In his second procedural argument defendant contends that the trial court erred in not applying the five-year statute of limitations for third-degree rape contained in former CPL section 30.10(2)(b),[FN1] since he was charged 5 years and 68 days after the date of the charged offense against Mann. Defendant asserts that the trial court should not have found that the statute of limitations was tolled by defendant's having been continuously outside the state for a period following the commission of the offense (CPL 30.10[4][a][i]). While defendant does not dispute that he spent 264 days outside New York during the statutory period, he maintains that the toll does not apply to residents of New York and that it only applies to nonresidents.
We disagree. The statute does not distinguish between residents and nonresidents, and had the legislature wanted to limit its reach to the latter it easily could have done so. Moreover, the People's interpretation is consistent with and furthers the statutory purpose. The statutory language "emphasizes [*12]the difficulty of apprehending a defendant who is outside the State . . . the criminal without regard to a showing of any specific intent of the defendant to thwart the prosecution by fleeing or hiding" (People v Seda, 93 NY2d 307, 312 [1999]). People v Knobel (94 NY2d 226 [1999]), on which defendant relies, is not instructive as to whether the statute applies to residents of the state, since the defendant was a nonresident in that case, and the Court of Appeals did not have occasion to address the statute's applicability to residents.
The first trial issue raised by defendant concerns the juror who was seated as Juror 11. Defendant contends that the court should have excused Juror 11, who, in answering a questionnaire for prospective jurors, wrote that her hobby was "novel writing," and that she had never "been the victim of physical or sexual abuse, either as a child or adult." The questionnaire asked whether the prospective juror, especially in light of defendant's notoriety, would determine the case based only on the evidence, to which she said she would. The juror also represented in her responses that she would be able to follow the court's instructions to avoid media coverage and using the Internet to follow the case, and that media coverage about the case which she had already consumed would not affect her ability to be a fair and impartial juror. Juror 11 stated that, in general, there was not any reason she could not be a fair and impartial juror to both sides, that there was nothing about the nature of the case that would affect her ability to be such a juror, and that there was nothing else she believed the court or the parties should know about her qualifications to serve.
Upon individual questioning, Juror 11 disclosed that she was writing a novel, scheduled to be released several months later, called Age of Consent. She said that it was about the struggles of the main characters: three teenage girls and their parents. In response to a question about the nature of the novel, the juror stated that: "All three girls have some relationship with an older man but it's not a predatory situation at all." The juror also, in response to a question from defendant's counsel, stated that she was not aware of any "press" about the book being about a predatory older man, and that she had not done any research into predatory older men or victims of sexual assault because the book was not about those subjects.
Defendant challenged Juror 11 for cause on the basis that she had not been forthcoming about the fact that her novel was about "predatory older men." He brought to the court's attention the fact that Juror 11's website described her novel as being "about three young women in the 1980s, who negotiate fraught friendships, sexuality, class and predatory older men on the journey from innocence to independence." Counsel argued that Juror 11 had a motivation to lie because service on the jury could increase sales of her book. The court rejected [*13]the challenge, indicating that it accepted the juror's sworn statement that her book was not about predatory older men.
After the jury was sworn, with Juror 11 as one of its members, defendant moved for a mistrial based on the selection of Juror 11, and, in the alternative, that she be removed for cause or at least be the subject of an evidentiary hearing. The application relied on not only the allegation that the juror purposely concealed the nature of her novel, but also an article in the Atlantic magazine about the death of the writer Elizabeth Wurtzel, which mentioned that Juror 11 was a friend of Wurtzel and stated that the juror "will be publishing her first novel this year, thanks in large part to [Wurtzel]'s example." The article quoted Juror 11 as stating, without elaboration, that Wurtzel's "fearlessness helped me tell my deeply personal story, albeit in novel form." Defendant posited that this showed that Juror 11's novel was semi-autobiographical, since she was 15 years old in 1983, the year in which the novel was set. This, defendant asserted, called into question her statement that she had never been sexually abused. Defendant also alerted the court to the fact that the juror's literary agent was promoting her novel to the same intended audience as a highly publicized book about sexual harassment that included the allegations against defendant.
The court denied the relief but agreed to question the juror. Just before opening statements, the court conducted an inquiry of Juror 11, in which it pointed out the phrase "predatory older men" on a printout of her website and asked if she knew the site used that expression. She said she had known this, but that she did not remember it when she was initially asked about the phrase in voir dire. She explained that her publisher wrote the copy, which her website designer borrowed. She claimed that when counsel asked her in voir dire about "press" references to predatory older men with regards to her novel, she understood the reference to mean media reports, not her personal or her publisher's own website. In any event, the juror stated, the term "predatory older men" in the context of her book did not have the connotation that one might ordinarily ascribe to the term, since the relationships in her novel were all consensual. The juror pointed out that her fictional book set in 1983 had "no relationship to a criminal case in 2020," and she reiterated her commitment to being fair and impartial as a juror. The court denied defendant's request for a mistrial and other relief with respect to Juror 11.
After summations, defendant asked the court to replace Juror 11 with an alternate, based on information that, during the time of the trial, she was reading a French memoir, Le Consentement, that was purportedly about the author's sexual relationship with a famous older man, and that she had reviewed another book, My Dark Vanessa, a novel involving a sexual relationship between an adult teacher and [*14]his teenage student. Defendant's counsel represented that Juror 11 had been reviewing books regarding predatory older men and lack of consent while seated as a juror, which counsel stated was in violation of the court's order not to do any investigations on similar cases. In response to the court's suggestion that the People voluntarily excuse the juror, the prosecutor argued that a book about a "child abuse situation" was unrelated to this case, and that Juror 11 was never instructed to refrain from reading books on any type of sexual abuse. The court then conducted another inquiry of Juror 11, who stated that she had not reviewed books about child abuse and predatory men. She did admit that she was reading the memoir, but only that she had indicated that fact on the Goodreads social media site. The court denied the motion. Later that day, defendant brought to the court's attention that days earlier the juror had indeed posted a review of My Dark Vanessa, which she had read that summer, in which she referenced "[t]he claustrophobia of [the author's] isolation, the repulsiveness of her predator and entrapment in the relationship." Nevertheless, the court denied defendant's request for a mistrial.
The Criminal Procedure Law provides two separate standards for a court to dismiss a juror for cause. During the selection process, a juror may be stricken for cause when she "has a state of mind that is likely to preclude [her] from rendering an impartial verdict based upon the evidence adduced at the trial" (CPL 270.20[1][b]). Once the jury is sworn, however, the party challenging a particular juror must show that the juror is "grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature" (CPL 270.35 [1]). Even then, a court is required to discharge a grossly unqualified juror only if it were to have become '''obvious' that [she] possesse[d] a state of mind which would prevent the rendering of an impartial verdict" (People v Kuzdzal, 31 NY3d 478, 483 [2018][citation omitted]). We review the question whether Juror 11 should not have been seated under a provident exercise of discretion standard (see People v Batticks, 35 NY3d 561, 566 [2020]). The trial judge "is accorded latitude" in assessing the juror's fitness to serve, since the court "is in the best position to assess partiality in an allegedly biased juror" (People v Spencer, 29 NY3d 302, 310 [2017]).
We find that the court providently exercised its discretion in determining that defendant failed to establish that Juror 11 harbored bias against him such that she should have been dismissed for cause during the selection process, or after the jury was sworn. Even applying the more lenient standard, defendant failed to establish that Juror 11 was dishonest when she was asked about her novel during voir dire, or that the subject matter of the novel itself should have indicated to the court that she was not likely to be able to effectively sit as a juror. To be sure, Juror [*15]11's own website and her publisher's website, in describing her novel as being about the young female protagonists' struggles with "predatory older men," contradicted her statements during jury selection that the book was not about such men. However, this is not indicative of any intent by the juror to lie. The novel was about teenage girls and the complainants against defendant were all adults, ranging in age from 22 to the early 30s. Additionally, there was a significant difference in the plot of the juror's novel, where the female characters did not consider the advances of the older men unwanted, and the issue at trial, which was whether defendant committed sexual assaults against the will of complainants. As a legal matter, a minor's consent to the advances of an older man might not prevent him from being considered a "predator." However, to a novelist, such distinctions may not be relevant, and it is plausible that the juror did not view her character as a "predator" in the traditional sense. Moreover, it is not implausible that Juror 11 was not intimately familiar with the description of how her novel was described by the publisher, since she was not responsible for creating the publicity around the book.
When defendant renewed his request that Juror 11 be discharged, the jury was already sworn, and the more demanding standard attached, requiring defendant to establish that Juror 11 was grossly unqualified to serve. To the extent defendant argues that the more lenient standard still applied, we note that the grounds for that motion, the online description of Juror 11's novel, which defendant directly confronted the juror with for the first time when he made the second application, as well as the Atlantic article, were known to defendant, or could have been discovered by him, in time to question her about them when he made the initial for-cause challenge during jury selection. Accordingly, the People are correct that any attempt to renew the original for-cause challenge after the jury was sworn was waived under CPL 270.15(4).
We find that it was not obvious after Juror 11 was questioned the second time that she was grossly disqualified from jury service. The juror explained under inquiry that she was not involved in the publicity for her book, and that, even if she had been, when she was asked about "press" during the initial questioning, she did not equate it with content on her own website. The juror also asserted that she did not consider the type of behavior displayed by the older male character in her novel to be equivalent to the alleged behavior of defendant, because the relationships in her novel were consensual. This at the very least called into question defendant's accusation that the juror was untruthful when she filled out her questionnaire and when she was confronted about the novel during jury selection. Certainly her answers did not provide the court with evidence making it "'obvious' that [Juror 11] possesse[[*16]d] a state of mind which would prevent the rendering of an impartial verdict" (People v Kuzdzal, 31 NY3d at 483). Nor should the quote in the Atlantic article have disqualified Juror 11. That quote, in which Juror 11 said that Elizabeth Wurtzel's "fearlessness helped me tell my deeply personal story, albeit in novel form," was exceedingly vague, and it is speculative to conclude that the juror was talking about experiences that could be likened to the victims who would be testifying about defendant. The short quote certainly cannot be read as an unequivocal statement that the juror had been a victim of sexual abuse or any crime, which she denied under oath.
Moreover, it was proper for the court to give weight to Juror 11's clear and unequivocal statements that she would be a fair and impartial juror. "Where prospective jurors unambiguously state that, despite preexisting opinions that might indicate bias, they will decide the case impartially and based on the evidence, the trial court has discretion to deny the challenge for cause if it determines that the juror's promise to be impartial is credible" (People v Arnold, 96 NY2d 358, 363 [2001]). Here, Juror 11 stated that she took defendant's "right to a fair and impartial jury trial very seriously." This Court has allowed such unequivocal affirmations by jurors of their ability to be impartial, even in the face of arguably more serious suggestions that the opposite was the case (see People v Nowlin, 297 AD2d 554, 555 [1st Dept 2002][case involved allegations of sexual abuse against two boys and juror had been sexually abused as a child]).
The trial court also providently exercised its discretion in denying defendant's third and final request to disqualify Juror 11. The court did create some confusion when it asked the juror whether she had "reviewed" a French book, since the juror had merely posted on the Goodreads website that she was reading that book; it was the novel, My Dark Vanessa, that she had posted a critique about. Thus, the juror was unquestionably being truthful when she answered that she had not "reviewed" the memoir. Further, after the court, before it denied the motion to discharge Juror 11, invited defendant's counsel to "tell me if there is something more," counsel did not alert the court that it had failed to inquire about Juror 11's review of the memoir. By not making a timely objection defendant failed to preserve any challenge to the court's procedure in conducting the juror inquiry (see People v Parilla, 27 NY3d 400, 405 [2016] ["argument that the trial court failed to engage in a probing and tactful inquiry of the juror is unpreserved."]) and we decline to review it in the interest of justice. In any event, even if the juror had known that the court was inquiring about the memoir, she did not necessarily mislead the court when she said she had not written reviews about "child abuse and predatory" men, since she might not have thought that the relationship [*17]depicted in the memoir was "abusive" or that the man who had the relationship with the author was a "predator." Further, Juror 11's comment on My Dark Vanessa, in which she referenced "[t]he claustrophobia of [the author's] isolation, the repulsiveness of her predator and entrapment in the relationship," did not indicate that she was likely to feel the same way about the real-life relationships she had heard about through the evidence in this case.
Finally, we reject defendant's argument that Juror 11 had a pecuniary interest in securing a seat on the jury. There is simply no basis to argue that the juror's service on the jury for defendant's trial would attract readers who otherwise would not have been inclined to read her novel.
Defendant next contends that the court permitted improper testimony by the People's expert, Dr. Ziv. While defendant attacks several specific elements of Dr. Ziv's testimony, the overarching theme of his argument is that the subject matter of the testimony was not beyond the ken of the typical juror, and that the entire purpose of the testimony was to bolster the credibility of the prosecution's witnesses, thus usurping the role of the jury as finders of fact. Many of defendant's specific arguments with respect to Dr. Ziv's testimony are unpreserved. Nevertheless, as a general proposition, we find that her testimony was squarely within the bounds of acceptable expert discourse.
"The admissibility of expert testimony is dependent on whether the expert testimony would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror," and "[g]enerally that determination is left to the sound discretion of the trial court" (People v Williams, 20 NY3d 579, 583-584 [2013] [internal quotation marks and citation omitted]). In People v Taylor (75 NY2d 277, 292 [1990]), the Court of Appeals held that "[e]xpert testimony" regarding rape trauma syndrome may be admitted to explain behavior of a victim that might appear unusual or that jurors may not be expected to understand. For instance, such testimony may be admissible "to dispel misconceptions that jurors might possess regarding the ordinary responses of rape victims in the first hours after their attack" (75 NY2d at 293 [1990]), or to explain why a victim who knows the perpetrator may delay reporting out of fear (id. at 292-293). Accordingly, we find that the trial court properly permitted Dr. Ziv to testify. Indeed, defendant has presented us with no authority suggesting that rape trauma syndrome has been discredited as a scientific phenomenon since People v Taylor was decided. And because the syndrome is shrouded by certain rape "myths," we can think of no more appropriate area where a jury requires the elucidation that can be facilitated by an expert witness. In other words, where there was a risk that the jury would be "puzzled" by some of the behaviors of the complainants [*18]during and after their sexual encounters with defendant, it was appropriate to admit "evidence of psychological syndromes" that would eliminate that confusion (People v Spicola, 16 NY3d 441, 465 [2011] , cert denied 565 US 942 [2011]). After all, defendant made clear that his defense would be based on those behaviors, which he would argue to the jury were inconsistent with how a victim of sexual assault would behave.
To be sure, any expert testimony is inadmissible when it is elicited by hypothetical questions that are narrowly tailored to include facts present in the case for which the expert is testifying (People v Williams, 20 NY3d at 584). Specifically, evidence about rape trauma syndrome may not be admitted when its sole purpose is to suggest that a sexual assault took place, as opposed to explaining why a victim's behavior differs from what a juror might presume it would be as a result of such a traumatic event. For example, in People v Banks, the companion case to People v Taylor, consent was not an issue because the victim was a minor. Thus, the only purpose for which testimony of rape trauma syndrome could have been offered was to prove that the incident took place at all. Dr. Ziv's testimony was properly admitted because, unlike in Williams, Dr. Ziv did not testify about, nor did any of the questions posed to her have embedded within them the specific facts related to by the complainants in their testimony about their encounters with defendant (Williams at 584). Indeed, Dr. Ziv testified that she did not know anything about the case.
Defendant presents a grab bag of arguments focused on specific passages from Dr. Ziv's testimony that are for the most part unpreserved. Specifically, defendant failed to preserve the following arguments regarding the People's expert: that the court should not have permitted her to testify that not "many women" allege that they have been raped or sexually assaulted "for secondary gain," and that it is "out of touch" to ask why a rape victim did not "scream"; that the expert improperly discussed perpetrators' behavior; that the People failed to provide notice of certain aspects of the expert's testimony; that the prosecutor's summation exacerbated alleged improprieties in the expert's testimony; and that the court should have held a Frye hearing on the expert's testimony about memory of sexual interactions. We decline to review these issues in the interest of justice. Moreover, none of these perceived errors, alone or together, resulted in prejudice to defendant. For example, he claims that it was error to allow Dr. Ziv to testify that women never lie about having been raped for "secondary gain," such as fame or money. But that is not what she said. In fact, she merely denied that "many women" allege rape for secondary gain, a far less categorical claim than that they never do. Moreover, that testimony was elicited on redirect to counter defendant's questions on cross-examination suggesting [*19]that the complainants may have lied for secondary gain.
Defendant further argues that Dr. Ziv went outside the bounds of what rape trauma syndrome is commonly understood to be by testifying that "[w]omen are usually raped by someone they know," since, he claims, this is not a behavioral characteristic. This argument falls short, because the testimony provided critical context for Dr. Ziv's testimony about victims' post-offense behavior, such as contacting the perpetrator and hesitating to report the offense, and rebutted the defense challenge to the victims' credibility (see People v Spicola, 16 NY3d at 463-64). After all, defendant's opposition to the People's notice of expert testimony had argued that the victims "failed to timely report the alleged assault" and "continued to communicate and associate with defendant after the alleged assault."
Defendant's argument that Dr. Ziv improperly testified that "You often hear women who have been sexually assaulted say they feel like damaged goods, they feel like I'm used goods anyway, why not," mischaracterizes that sentence as referring to "self-harm." In fact, Dr. Ziv was explaining why victims sometimes remain in contact with their perpetrator. To the extent defendant argues that Dr. Ziv prejudiced him by itemizing behaviors that victims sometimes engage in after a sexual assault, such as cutting or burning themselves, and turning to drugs and alcohol, she clarified that none of those behaviors are indicative of whether a sexual assault occurred or not.
Contrary to defendant's argument, Dr. Ziv did not usurp the jury's role by testifying that in her work she had assessed the credibility of alleged victims and perpetrators by considering whether the allegations in a particular case were consistent with the patterns of behavior of victims and perpetrators described in the literature. There was no indication from Dr. Ziv's testimony that she was familiar with the particular allegations facing defendant, and as such no basis to conclude that Dr. Ziv had any opinion about the credibility of defendant's accusers.
Insofar as defendant contends that the court should have granted his motion for a Frye hearing (Frye v United States, 293 F 1013 [DC Cir 1923]) as to Dr. Ziv's expert testimony on rape trauma syndrome, the court providently exercised its discretion in denying that request. As stated above, rape trauma syndrome has been widely accepted by courts as a proper subject of expert testimony, and there is no indication that Dr. Ziv testified about any novel theories or techniques about the syndrome.
Finally, to the extent that defendant argues that the prosecutor's summation improperly emphasized Dr. Ziv's testimony, "[t]he prosecutor's remarks accurately reflected the opinion testimony of the sexual abuse expert" (People v Mendez, 189 AD2d 651, 652 [1st Dept], lv denied 81 NY2d 889 [1993]). Far from usurping the jury's role, the prosecutor reminded the jury that Dr. Ziv did not "know anything about [*20]the facts of this case specifically," and merely offered "[her] general knowledge of the scientific field."
In addition to arguing that Dr. Ziv's testimony went outside the bounds of accepted expert testimony, defendant takes issue with the trial court's decision to preclude him from questioning his designated experts about factors affecting memory of sexual encounters, or statistics on false or delayed reporting of sex offenses. This, he argues, prevented him from challenging the methods used in developing the data Dr. Ziv relied on, and introducing data that she had overlooked. The court's decision to preclude the defense experts from testifying about memory of sexual encounters was based on perceived flaws in their own cowritten article about memory of sexual interactions, which their testimony would have relied on, and which admitted that "little memory research has directly addressed memory for sexual interactions." Defendant contends that the article was addressed to memory for sexual consent communications specifically, and not to memory for sexual interactions, generally. However, that is an unsatisfying distinction in the context of this case, where the same dynamics inherent in the case study that precedes the statement on which the court relied are present here. That is, defendant and his accusers were well acquainted, there was a plausible explanation for why consent to sex would have been given, and signs of resistance were not abundantly clear. Accordingly, it was a provident exercise of the court's discretion to view the proposed testimony as lacking in scientific foundation. We note that, to the extent defendant now asserts that there is an extensive body of research addressing memory in the context of sexual assault, he cites no such research. In any event, we note that the court allowed Dr. Loftus to testify extensively about the unreliability of memories, including of traumatic events. Defendant has failed to explain how Dr. Loftus's opinion would have materially differed in discussing the specific traumatic event that is sexual assault.
The People do not dispute defendant's point that their notice did not refer to Dr. Ziv's testimony about memory of sexual encounters. However, as the People note, that argument is unpreserved in the absence of any timely objection, since it was apparently not raised until defendant's January 27, 2020 letter motion three days after Dr. Ziv's testimony. Even so, considering that the overwhelming proportion of Dr. Ziv's testimony about memory was about its general properties, it cannot be said that any testimony by Dr. Ziv about memory in the specific context of sexual assaults likely had any impact on the jury.
We now turn to defendant's argument that he was prejudiced by the court's decision to permit evidence of uncharged crimes. People v Molineux (168 NY264 [1901], supra) held that offenses committed by a criminal defendant that are not part of the corpus of facts supporting the specific [*21]charges against him are inadmissible. This is because "a criminal case should be tried on the facts and not on the basis of a defendant's propensity to commit the crime charged. It is axiomatic that propensity evidence invites a jury to misfocus, if not base its verdict, on a defendant's prior crime rather than on the evidence — or lack of evidence — relating to the case before it" (People v Rojas, 97 NY2d 32, 36-37 [2001]). Molineux identified five broad and non-exclusive categories of exceptions to this rule, stating that "[g]enerally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; [and] (5) the identity of the person charged with the commission of the crime on trial" (168 NY at 293). To be admissible, Molineux evidence must "logically be connected to some specific material issue in the case" (People v Cass, 18 NY3d 553, 559 [2012]).
The People maintain that the Molineux evidence was properly admitted under the recognized exception for intent. They argue that defendant, prior to trial, publicized that his defense to the charges against him would be that, while he did engage in the charged sexual encounters with complainants, the encounters were mutually consensual, and that he thus did not intend to use forcible compulsion against them. The People maintain that the Molineux evidence was proper to combat defendant's expected attempt at trial to point to activity outside the charged encounters as proving that the sexual encounters could not have been unwanted. These, the People assumed, would include Haley's acceptance of a trip to Los Angeles after the charged crime, and an occasion where defendant did not attempt to initiate sex with Haley after she mentioned his "terrible reputation with women." The People also anticipated that defendant would point to sexual encounters with Mann prior to and after the incident in the Doubletree Hotel, where she did not overtly protest against his advances, and claim that those incidents negate the possibility that he ever acted against her will. The People argue that if defendant's position was that the overall context of his relationships with Haley and Mann showed that his intent was not to have sex with the women without their consent, they were entitled, through the testimony of Young, Dunning and Wulff, to neutralize that defense by showing his behavior in other contexts that had essential similarities but lacked the factors that masked his intent with respect to Haley and Mann.
Defendant maintains that the testimony of Young, Dunning and Wulff was not necessary because, if the People were to satisfy all the elements of those crimes for which he was charged, the intent behind his actions against Haley and Mann would be evident on [*22]its face. For example, he notes that, for the People to prove criminal sexual act in the first degree against Haley, and rape in the first degree against Mann, the "forcible compulsion" element of the crime (Penal Law § 130.50[1]) would have been obvious, without the need to use evidence of other crimes to illuminate his intent. In this regard, defendant relies on People v Vargas (88 NY2d 856 [1996]), in which the Court of Appeals held that the trial court improperly admitted evidence of previous uncharged sexual assaults allegedly committed by the defendant. In Vargas, the defendant was charged with following the complainant onto an elevator, then blindfolding her, dragging her to the building's roof, and raping her. The complainant told police that, immediately after the rape, in order to trap the defendant and deliver him to the police, she exchanged phone numbers with him, and arranged to meet him the next day. She admitted that when she came to his apartment the next day, she had consensual sex with him.
The defendant in Vargas told the police that both encounters were consensual. In light of that claim, the People argued that evidence of prior incidents in which the defendant had accosted women and demanded sex, fondled them or engaged in sexually deviant behavior, was necessary to counter his claimed lack of intent to commit rape against the complainant. The Court of Appeals reversed the defendant's conviction, finding that "two starkly contrasting scenarios were presented, with only credibility in issue" (88 NY2d at 858). The Court observed that, if the jury believed the complainant, there was little doubt that they would find that the defendant intended to rape her. If the jury believed the defendant, it would be rather obvious that the encounter was consensual and that the defendant did not have the requisite intent. Thus, the evidence of prior sexual assaults could only go to the improper purpose of showing the defendant's propensity to commit sexual offenses.
The scenarios described by Haley and Mann at defendant's trial did not present the stark contrasts involved in Vargas. To the contrary, Vargas is distinguishable because the incidents involving Haley and Mann were extremely nuanced. Indeed, defendant's reliance on Vargas reveals that his focus is too narrow in scope. Vargas differs from this case because there was no dispute in Vargas that the defendant and his victim did not know each other until the day of the encounter, and there were no unique factors making ambiguous the question whether the defendant in Vargas intended to have sex with the victim without her consent. Here, defendant knew Haley and Mann for months and years before the charged acts. Moreover, unlike in Vargas, defendant had not only his stature in the entertainment industry as a reason to explain why Haley and Mann would have wanted to pay him sexual favors, but also a series of encounters he could point to before and after the charged incidents to suggest [*23]that he was in a relationship with the women where the charged sexual advances would not have been unexpected or unwelcomed.
Without anything further, the jury could have easily believed that the incidents happened exactly the way Haley and Mann described them, but still concluded that defendant reasonably believed that they consented because of the way that, before and after the charged incidents, they had befriended him, flattered him, accepted his assistance, and engaged in other sexual acts with him that were consensual. The Molineux evidence was designed to show that defendant did not see the women as romantic partners or friends, and that his interest in them and their talents was feigned. In other words, the People proposed to show through the uncharged acts evidence that defendant's goal at all times was to position the women in such a way that he could have sex with them, and that whether the women consented or not was irrelevant to him. The testimony of Young, Dunning and Wulff accomplished this, because each witness described an arc of events where defendant met her, flattered her by expressing his willingness to help her advance her career in Hollywood, and then put in motion a plan where he could be alone with her. As soon as it was opportune, he made an overt sexual advance for which there was no indication that there was consent. The fact that each of the women reacted negatively to defendant's advances was helpful to demonstrate to the jury that defendant knew that a woman would not consent to having sex with him merely as a quid pro quo for the assistance he could provide them in their professional career.
From the People's perspective, there was a significant risk that the jury would have concluded that defendant did not intend to compel the women to have sex with him. By introducing the Molineux evidence, the People were able to counter defendant's narrative, by showing that the offenses against Haley and Mann were simply more elaborate manifestations of his practice of baiting women with opportunities for career advancement, and then taking advantage, all the while being completely uninterested in whether the women welcomed his advances, and being determined to go forward whether or not they did. Of course, the People could have attempted to prove defendant's guilt merely by relying on the testimony of Haley, Mann and Sciorra, but that is an insufficient reason to preclude Molineux evidence (People v Alvino, 71 NY2d 233, 245 [1987]).
Defendant argues that Dunning, Wulff and Young's testimony was not probative of his intent because there was no forcible compulsion in the episodes they recounted. This misunderstands the purpose of the evidence. The People introduced the testimony because it eroded defendant's claim that the events leading up to his assaults on Haley and Mann were, as he characterizes them in his brief, "commonplace, noncriminal courting behaviors." To the contrary, Dunning, Wulff and Young helped to fill out [*24]a picture of defendant as having no interest in "courting" women in the traditional sense of building a romantic connection. Rather, their testimony was offered to demonstrate that defendant's interest in Haley and Mann was strictly for the purpose of smoothing the way to a sexual encounter. While such interest is of course not, in itself, criminal, it was useful information to supply to the jury to permit it to fully understand the dynamics between defendant and his victims.
The uncharged incidents in which Mann testified that defendant sexually assaulted her before and then again after the charged incident were also "admissible to provide context for the abusive relationship[s] between defendant and [her], to make it comprehensible and to enhance its credibility" (People v Jackson, 133 AD3d 474, 475 [1st Dept 2015], lv denied 26 NY3d 1146 [2016]). The testimony demonstrated how defendant lured her with the prospect of career opportunities before subjecting her to nonconsensual sex acts, yet continued to remain on good terms with her by abusing her trust and his power in the movie industry (see People v Angel, 238 AD2d 210, 211 [1st Dept 1997], lv denied 90 NY2d 1009 [1997] [uncharged crimes admissible to show "background events explaining the relationship between the parties leading up to the instant incident"]). In addition, the court providently exercised its discretion by permitting Mann to testify about defendant's disproportionate anger when met with opposition and statements suggesting he had a vengeful streak, since the evidence gave further context to Mann's decision not to report defendant's offenses and to keep him in her orbit after the attacks (see People v Rodriguez, 159 AD3d 631 [1st Dept 2018]).
We perceive no error in the court's permitting portions of Postacchini's testimony concerning the incident that Mann herself testified about involving a proposed threesome. Postacchini's testimony that she felt "manipulated" or "tricked" by defendant came out through defendant's counsel's own questioning on cross-examination. Furthermore, the court was correct in its observation that other incidents that Mann referred to in her testimony such as sexual remarks defendant made to her during sex or his having once urinated on her were not crimes or bad acts necessitating Molineux gatekeeping (see People v Brewer, 28 NY3d 271, 276 [2016]). Nor was introduction of the Molineux evidence tantamount to an amendment of the indictment, since the People's theory of the case never departed from the charges therein (see People v Rivera, 84 NY2d 766, 771 [1995]).
Finally, defendant maintains that, even if the evidence fell within the Molineux exception, its prejudice to him still outweighed its helpfulness to the People. We disagree. It is inherent in the nature of Molineux evidence that it will be detrimental to a defendant's interests; the case law consistently presumes that there will be some degree of prejudice to a defendant. Indeed, "[d]etermining [*25]whether the probity of such evidence exceeds the prejudice to the defendant 'is a delicate business,' and as in almost every case involving Molineux or Molineux-type evidence, there is the risk that 'uncharged crime testimony may improperly divert the jury from the case at hand or introduce more prejudice than evidentiary value" (People v Morris, 21 NY3d 588, 596-597 [2013], quoting People v Resek, 3 NY3d 385, 389 [2004]). Defendant suggests, without offering any support, that because of the enormous publicity generated by his trial and what he perceives as negative media coverage generated by the "#MeToo movement" the court had a heightened obligation in the way it balanced prejudice against probativeness. He further posits that the analysis should be more thorough where the Molineux evidence is of a sexual nature.
Because, as described above, the decision whether to admit Molineux evidence is a "delicate" one, the decision is left to the sound discretion of the trial court and the decision will not be overturned unless there is an improvident exercise of that discretion (see id.). Moreover, the decision to admit the evidence "may not be disturbed simply because a contrary determination could have been made or would have been reasonable" (id.). Here, the trial court carefully considered the People's submission and articulated its reasoning why the proffered evidence was probative of defendant's intent and his knowledge that complainants did not consent to his advances. The court's decision to limit the number of Molineux witnesses the People proposed to introduce further demonstrates the court's cognizance of the potential for prejudice to defendant, as did the thorough limiting instructions it gave after Mann's testimony, after the uncharged victims' testimony, and in the final jury charge, which we can presume the jury followed (id. at 598).
Defendant further maintains that the trial was unfair insofar as he was deprived of his constitutional right to take the stand in his own defense when the court granted in part the People's Sandoval motion. The Sandoval ruling permitted the People to ask defendant about the sex offenses against the three uncharged victims admitted by the Molineux ruling, and the uncharged bad acts against Sciorra about which she testified at trial. The court also allowed the People to ask defendant about, inter alia, whether he used a friend's Social Security number to obtain a passport; told people to lie to his wife; told Black Cube, an intelligence firm, to manipulate or lie to people; scheduled a business meeting in 2012 with a woman under false pretenses; and engaged in a variety of business-related misconduct that ranged from encouraging executives to lie on his behalf to threats and acts of violence against people who worked for him, including abandoning a colleague by the side of the road in a foreign country. The court also allowed the People to ask about incidents of bullying, including when at a hotel restaurant [*26]defendant screamed and cursed at the staff, demanding to be served a meal late at night. Indeed, the Sandoval ruling allowed the People to cross-examine defendant about 28 acts spanning nearly 30 years.
The amount of Sandoval material is unquestionably large, and, at first blush, perhaps appears to be troublingly so. Nevertheless, in considering the propriety of whether to admit Sandoval material, and how much, the Court of Appeals has plainly stated that "the determination rests largely within the reviewable discretion of the trial court, to be exercised in light of the facts and circumstances of the particular case before it" (People v Hayes, 97 NY2d 203, 208 [2002]). While we acknowledge the sheer size of the impeachment material that the court allowed, we have analyzed that decision within the larger context of all of the circumstances presented by this case, and have concluded that the court providently exercised its discretion.
In determining the impeachment material a prosecutor may resort to in cross- examining a criminal defendant, evidence of "specific criminal, vicious or immoral conduct should be admitted if the nature of such conduct or the circumstances in which it occurred bear logically and reasonably on the issue of credibility" (People v Sandoval, 34 NY2d 371, 376 [1974]). The unique nature of the instant case required consideration of material not typically encountered in the ordinary case.
Here, all of the material allowed by the court was unquestionably relevant. Allegations that defendant solicited lies or deception went directly to his credibility (see Sandoval, 34 NY2d at 377). His abusive or violent behavior in business settings "reflected a willingness to place [his] self-interest above the interests of another person" (People v Wells, 51 AD3d 403, 403 [1st Dept], lv denied 10 NY3d 965 [2008]).
Further, given the unique facts of this case, the court imposed reasonable limitations by limiting the extent to which the material was of a sexual nature, with the exception of that which was independently admitted under Molineux. It also took care to reject aspects of the People's application that went to defendant's general propensity to bullying and brutish behavior, and which lacked specificity. While the number of bad acts allowed was large in this case, numerosity alone is not a basis for finding that the trial court abused its discretion. "[T]here are no per se rules requiring preclusion because of the age, nature and number of a defendant's prior crimes" (People v Walker, 83 NY2d 455, 459 [1994]). Here the bad acts consisted of largely boorish and deceptive behavior. They did not involve any convictions, which arguably would have been more prejudicial.
It must also be noted that for all the Sandoval material the court allowed, it also rejected significant parts of the People's application, precluding them from cross-examining defendant about five acts of sexual misconduct committed against women who were not the subjects [*27]of the charges or the Molineux ruling, and allegations involving sex such as that he put an intern's hand on his genitals, asked people to lie to his wife to conceal his infidelity, and told his assistant to procure prostitutes for him. The court precluded the People from asking about defendant's statement to Mann that he would send men with bats after her father, unless the People could show that the statement included "a lie" such as his claim to have engaged in similar conduct. The court also precluded the People from asking about allegations by four of his employees and three of his drivers, which were too general or lacked sufficient probative value. Accordingly, we are satisfied that, on balance, the court gave careful consideration to the potential prejudice to defendant, and made a reasoned ruling that did not amount to an abuse of discretion.
We also reject defendant's argument that the court should have conducted an inquiry to verify the allegations at issue. The People met their burden of showing "a reasonable basis in fact" for those allegations (People v Duffy, 36 NY2d 258, 262 [1975], cert denied 423 US 861 [1975]), which were based on witnesses' personal observations recounted in interviews with law enforcement or the People; (see e.g. People v Melendez, 74 AD3d 629, 630 [1st Dept 2010], lv denied 15 NY3d 807 [2010] [statement to fellow inmate to whom defendant admitted robberies provided reasonable basis for cross-examination]). We note, as well, that defendant made at most a half-hearted attempt at trial to challenge the allegations forming the basis for the Sandoval material. Indeed, he failed to question the propriety of many of them, and did not even respond to the People's supplemental Sandoval application, which sought to introduce 11 additional bad acts. Nor did he object after the court issued its decision permitting three of those acts. Moreover, on appeal, other than complaining about the number of acts allowed, and generally characterizing them as "vague," "bizarre," "brutish," and "broad," defendant does not explain why any of the acts were not appropriate impeachment material or were prejudicial.
The conviction of third-degree rape, for which the People had to show that defendant engaged in sexual intercourse with Mann without her consent, was supported by sufficient evidence (see Penal Law § 130.25[3]). Mann testified that defendant slammed the door to his hotel room twice after she opened it slightly, and that after she failed to comply with his order to undress, he grabbed her hand and used it to undress her, after which she stopped resisting and obeyed defendant. Under these circumstances, a neutral observer would have understood that Mann had "expresse[d] an unwillingness to engage in the sexual act" (People v Newton, 8 NY3d 460, 464 [2007]). Based on her testimony, Mann's actions immediately before and after the incident were not necessarily indicative of her acquiescence in the actual assault.
Nor was the [*28]conviction against the weight of the evidence. In order to conclude that it was, we would first need to determine that a different verdict would not have been unreasonable, and then, that after weighing conflicting testimony and reviewing rational inferences, the jury was not justified in finding defendant guilty beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 348-349 [2007]). This we cannot conclude. Defendant argues that the complainants lacked credibility, in light of their continued association and sex with him after the charged sex offenses against them, and their delay in reporting the offenses. With respect to Mann, he points to the testimony of Maia and Richards about Mann's demeanor immediately after the incident that led to the rape charges, which he asserts was inconsistent with someone who had just suffered a traumatic experience. As far as Haley is concerned, he notes that she was unable to recall important details of the incident that led to the charges.
The jury could have chosen to believe that defendant acted without their consent notwithstanding the complainants' behavior before and after the events in question. This was especially so in light of Dr. Ziv's testimony that victims of sex offenses often remain in contact with the perpetrators and delay reporting the offenses. The jury could have rationally concluded that Haley and Mann's behavior was consistent with this phenomenon, and that conclusion is entitled to "[g]reat deference" (People v Bleakley, 69 NY2d 490, 495 [1987]). Further, Haley's account was supported by the testimony of her friend Elizabeth Entin, with whom she was living at the time of the incident, and who testified that Haley told her about defendant's assault of her shortly thereafter, and that she seemed withdrawn afterwards. To be sure, defendant claims that Entin's testimony suspiciously "mirrored" Haley's testimony with respect to the assault itself, and that it contradicted Haley's on details of Haley's overall relationship with defendant. However, any such perceived deficiencies in the testimony "only implicate issues of credibility," which was the jury's province to resolve (see People v Bell, 153 AD3d 401, 412 [1st Dept 2017]).
To the extent that defendant asserts that Mann's accusations were driven by her "Borderline Personality Disorder," we note that there is no indication that she was ever diagnosed with that condition. Further, defendant's arguments about Mann's admitting to "lying and deceptive behavior" is unavailing because the deception she was discussing went to the very reason why she did not report defendant's assault and continued to maintain contact with him; i.e., in order to avoid triggering the anger and vindictiveness she feared would emerge if she were to expose his assault.
We perceive no basis for reducing the sentence, and we have considered defendant's remaining arguments and find them unavailing.
Accordingly, the judgment of the Supreme Court, New York County [*29](James M. Burke, J.), rendered March 11, 2020, convicting defendant, after a jury trial, of criminal sexual act in the first degree and rape in the third degree, and sentencing him to consecutive terms of 20 years and 3 years, respectively, should be affirmed.
Judgment Supreme Court, New York County (James M. Burke, J.), rendered March 11, 2020, affirmed.
Opinion by Mazzarelli, J. All concur.
Manzanet-Daniels, J.P., Gische, Kern, Mazzarelli, Gesmer, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: June 2, 2022

Footnotes

Footnote 1: The statute of limitations was later increased to 10 years (CPL 30.10[a-2], as added by L 2019, ch 315, § 2, eff. Sept. 18, 2019).